UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KEVIN BENNER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 20-cv-12269-ADB |
| | * | |
| DOUGLAS H. DEMOURA, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.,

Pro se Plaintiff Kevin Benner ("Benner" or "Plaintiff") seeks monetary damages from five correctional medical providers, Dr. Aysha Hameed, Herbert Ddungu, Jenny Vieira, Joanne Stachowicz, and Mary Ellen Dolan (collectively, "Defendants"), alleging that they acted with deliberate indifference to his serious medical needs while he was incarcerated at MCI-Cedar Junction in Walpole, Massachusetts. Currently before the Court is Defendants' motion for summary judgment, [ECF No. 67], which, for the reasons set forth below, is **GRANTED**.

**I.   Background**

**A.  Local Rule 56.1**

Local Rule 56.1 provides that "[a] party opposing [a] motion [for summary judgment] shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documents." L.R. 56.1. Benner, in his opposition, did not directly respond to Defendants' statement of undisputed facts ("SOF"), but instead included in his brief only his own

1

characterization of the facts without citations to the nearly seventy-five pages of attached exhibits. See generally [ECF Nos. 71, 71-1]. These exhibits appear to consist primarily of Benner's medical records, as well as several medical grievances Benner filed while at MCI-Cedar Junction. Some of the documents have handwritten annotations that appear to have been drafted by Benner. See, e.g., [ECF No. 71-1 at 28, 62]. Local Rule 56.1 also states that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." L.R. 56.1.

Nevertheless, "'[d]istrict courts enjoy broad latitude' in adopting and administering such local rules." NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 6 (1st Cir. 2002) (quoting Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 1994); see also Ramsdell v. Bowles, 64 F.3d 5, 7 (1st Cir. 1995) (noting district court's "great leeway in the application and enforcement of its local rules"). As such, "[w]here a party opposing a motion for summary judgment fails to comply with Local Rule 56.1, the court has the discretion to decide whether to impose the sanction of deeming the moving party's factual assertions to be admitted." Butters v. Wells Fargo Advisors, LLC, No. 10-cv-10072, 2012 WL 5959986, at *2 (D. Mass. Nov. 27, 2012) (citing Swallow v. Fetzer Vineyards, 46 F. App'x 636, 638–39 (1st Cir. 2002)) (further citation omitted); Plourde v. Sorin Grp. USA, Inc., 517 F. Supp. 3d 76, 81 (D. Mass. 2021) (quoting Butters, 2012 WL 5959986, at *2) (same).

Additionally, courts "are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, we hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects." Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir.

2008) (citations omitted). Nonetheless, "self-representation is not 'a license not to comply with relevant rules of procedural and substantive law.'" Andrews v. Bechtel Power Corp., 780 F.2d 124, 140 (1st Cir. 1985) (citation omitted). "Thus, the Court will consider a pro se movant's circumstances when reviewing his motion for summary judgment but will not provide 'extra procedural swaddling.'" Grossman v. Martin, 566 F. Supp. 3d 136, 143 (D.R.I. 2021) (quoting Eagle Eye Fishing Corp. v. U.S. Dep't of Com., 20 F.3d 503, 506 (1st Cir. 1994)). Pursuant to the Court's discretion and in light of Benner's pro se status, the Court will consider any factual disputes specifically raised by Benner and/or the summary judgment record. If undisputed, the facts stated in Defendants' statements of material facts are deemed admitted, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.

## II. Material Facts

### A. Plaintiff's History with Internal Hemorrhoids and Abdominal Complaints

Prior to arriving at MCI-Cedar Junction on September 24, 2020, Benner was confined at the Norfolk County House of Correction ("HOC"), where he reported diarrhea, rectal bleeding, and chronic abdominal pain that improved with a bland diet. [ECF No. 68-1 ¶¶ 1–3]. A gastroenterologist performed a colonoscopy and endoscopy on Benner at the Lemuel Shattuck Hospital ("LSH") on September 2, 2020, which revealed internal hemorrhoids. [Id. ¶¶ 2–3]. The colonoscopy and endoscopy did not reveal inflammatory areas. [Id. ¶ 3]. Testing results on a polyp removed from the ascending colon remained pending. [Id. ¶ 2].

### B. Plaintiff's Treatment at MCI-Cedar Junction

#### i. Treatment for Internal Hemorrhoids and Abdominal Complaints

Benner's first medical examination at MCI-Cedar Junction occurred at the time of his September 24, 2020 admission, when he received both an initial mental health appraisal and a

medical screen. [ECF No. 68-1 ¶¶ 4–5]. He also met with a registered nurse, who noted that Benner voiced "multiple, vague somatic complaints" and described him as a "poor historian." [Id. ¶ 6]. During this initial appraisal, it was also noted that he had undergone a colonoscopy at LSH that revealed "some polyps," and that the biopsy results were pending. [Id.].

Defendant Vieira gave Benner another health assessment a few weeks later on October 3, 2020, at which time he denied having gastrointestinal ("GI") issues such as diarrhea, nausea, vomiting, heartburn, changes in bowel pattern, or blood in stool. [ECF No. 68-1 ¶ 17]. The physical examination results were normal, other than that Benner refused genitourinary and rectal examinations, which he refused again two days later. [Id. ¶¶ 17–18].

On October 18, 2020, a nurse saw Benner for his first complaint of abdominal pain. [ECF No. 68-1 ¶ 20]. He also reported having serious GI issues for at least the past 10 to 12 months. [Id.]. The nurse noted that his vital signs were normal, his abdomen was soft, not distended, his bowel sounds were active in all four quadrants, and he appeared to be stable and in no apparent distress. [Id.]. The nurse notified the on-call provider and scheduled Benner for follow-up with nursing the next day to check vitals and bowel sounds. [Id.]. The next day Benner saw a registered nurse and Defendant Hameed. [Id. ¶¶ 20–21]. Defendant Hameed performed a physical examination, which was normal, and she also reviewed Benner's history, noting that he had a normal colonoscopy on September 2, 2020 and that the colonoscopy diagnosed internal hemorrhoids. [Id. ¶ 22]. She ordered a complete blood count and three stool tests to detect occult blood in Benner's stool. [Id.]. Two of these three tests came back positive

4

for blood on October 23 and 24, 2020, which Defendant Hameed determined was consistent with Benner's internal hemorrhoids.[1] [Id. ¶¶ 22, 41].

Benner was subsequently seen either in triage or by providers for complaints of abdominal pain, food poisoning, stomach infection, worms, and various other GI issues on October 23, 24, 26, 29, and 31, 2020 and November 5 and 9, 2020. [ECF No. 68-1 ¶ 37; see also id. ¶¶ 26–28, 31–32, 34–35].[2] At several of these visits, Benner was informed that the provider planned to see him upon receipt of the pathology report for his polyp, which could be in the next two to three weeks. [Id. ¶¶ 26, 31–32]. Across these visits, the nurses and providers also, among other things, ordered a bland diet for Benner given that this had previously helped him [id. ¶¶ 28, 32, 33]; assessed his vital signs (or educated him on the benefits of vitals if he refused) [id. ¶¶ 31, 35]; performed physical exams [id. ¶¶ 32, 34–35]; and encouraged him to speak to mental health providers about anxiety and somatic symptoms [id. ¶ 34]. In response, Benner, among other things, asked that the nurses and providers run tests on his stool [id. ¶¶ 26, 32, 35]; requested antibiotics for an alleged stomach infection [id. ¶ 31]; and denied experiencing abdominal pain or bowel issues [id. ¶ 34].

---

[1] The parties dispute when, if ever, Benner was informed of these positive results. Benner appears to claim that he was never informed of these positive guaiac cards. [ECF No. 71 at 4 ("When 2 out of 3 stool sample cards tested positive for blood Jenny Vieira failed to tell me about the results…")]. Defendants' SOF states that Benner was informed of the results on October 24, 2020. [ECF No. 68-1 at ¶ 27]. The records submitted also reflect that Benner filed a grievance on November 11, 2020, which noted that he "was not told [his] stool samples were positive for blood," meaning he presumably knew at that time, [ECF No. 71-1 at 45]. Construing the facts in Benner's favor, the Court finds that Benner was informed of the results by November 11, 2020.

[2] These include visits with and examinations by Defendants Vieira, [ECF No. 68-1 at ¶¶ 28, 34], Stachowicz, [id. ¶ 31], and Dolan, [id. ¶¶ 32, 35].

Defendant Vieira received Benner's polyp pathology report from LSH on November 10, 2020. [ECF No. 68-1 ¶ 36]. It indicated no signs of active infection or ulceration in the stomach lining or of bacteria that could lead to chronic active gastritis (a chronic inflammatory response) and no evidence of inflammation of the esophagus. [Id.]. The colon polyp stain was negative, supporting the other diagnoses of no infection or bacteria and of internal hemorrhoids. [Id.].

Between November 11 and December 31, 2020, Benner was seen either in triage or by providers for GI-related complaints nearly a dozen times. [ECF No. 68-1 ¶¶ 37, 41, 43–45, 52–53, 55, 57; ECF No. 68-3 at 122–23].[3] Providers and nurses continued to physically examine Benner, take his vitals, and inform him that his tests were normal. [Id. ¶¶ 37, 41, 43–44; ECF No. 68-3 at 122–23]. They also continued to advise Benner that he had internal hemorrhoids and to provide him with suppositories, hemorrhoid cream, and petroleum-based A&D ointment. [Id. ¶¶ 43, 44, 51, 53, 55, 57; ECF No. 68-3 at 122–23]. Benner refused to use the prescribed hemorrhoid cream and suppositories because it burned. [Id. ¶ 52]. Benner also continued to request additional testing. [Id. ¶¶ 44, 49, 52, 55; ECF No. 68-2 at ¶¶ 44, 60].

On at least two occasions at the end of December 2020 Benner asked to be seen and was not seen in triage or by a provider.[4] More specifically, a nurse declined to call Benner to triage on December 15, 2020 because he had been seen four days earlier by a provider, and he was not

---

[3] These include visits with and examinations by Defendants Stachowicz, [ECF No. 68-1 ¶ 37], Hameed, [id. ¶ 41], Ddungu, [id. ¶¶ 53, 57; ECF No. 68-3 at 122–23], and Dolan [id. ¶ 52].

[4] The Parties dispute how many times Benner was turned away by triage or a provider at the end of December. Benner has provided evidence that he was turned away at least three times. [ECF No. 71-1 at 73 (grievance filed December 21, 2020 in which Benner alleges that he was been removed from the triage list twice that week); id. at 6 (nursing progress note dated December 29, 2021 indicating Benner was "on the schedule to be seen by provider but was not called down")]. Given the number of times Benner was in fact seen during December, this Court does not view this dispute as material to whether Benner received constitutionally appropriate care, as discussed infra.

seen in triage again three days later.⁵ [ECF No. 68-1 ¶¶ 49, 51]. Benner was then seen by Defendant Ddungu on December 31, 2020, who performed an anal examination which showed no indication for antibiotic treatment, special tests, or a surgery referral. [Id. ¶ 57].

### ii. Chest Pains/COVID-19

In mid-January 2021, Benner was seen multiple times by nurses, providers, and mental health clinicians for complaints of chest pain and difficulty breathing. [ECF No. 68-1 ¶¶ 60–62]. On January 20, 2021, Defendant Vieira saw Benner for back discomfort, and she determined that he was presenting with COVID-19 symptoms. [Id. ¶ 63]. Benner was then tested for COVID-19, and the test came back positive. [Id. ¶¶ 63–64]. Nurses checked in on Benner almost daily while he was in isolation for COVID-19. [Id. ¶¶ 65–71]. On a few such visits, Benner requested Chlor-Trimeton ("CTM") for congestion, which a provider informed him was not clinically indicated. [Id. ¶¶ 66–67].

After Benner continued to report chest pain in early February 2021, on February 8, 2021, Defendant Hameed examined him and ordered chest x-rays to rule out pneumonia from Benner's COVID-19 infection, as well as an electrocardiogram ("EKG"). [ECF No. 68-1 ¶¶ 72–76]. The x-rays came back negative for signs of pneumonia, and the EKG was normal. [Id. ¶ 76].

### iii. Mental Health Treatment

In addition to responding to Benner's various physical symptoms as described above, Defendants and others also worked to address his mental health. Upon his admission to MCI-Cedar Junction, Benner self-reported prior treatment for anxiety, depression, and PTSD, and he

---

⁵ Defendants' SOF and supporting documentation is ambiguous as to whether Benner was seen in triage on December 18, 2020. [ECF No. 68-1 ¶ 51 (noting Benner submitted a sick slip but not indicating if he was seen); ECF No. 68-3 at 114 (same)]. Benner says he was not seen. [ECF No. 71-1 at 72]. Construing the facts most favorably to the non-moving party, the Court finds that Benner was not seen on December 18, 2020.

received an initial psychiatric evaluation the following day. [ECF No. 68-1 ¶¶ 5–6, 8]. At this evaluation, he declined to consider medication. [Id. ¶ 8].

During his stay at MCI-Cedar Junction, mental health staff worked to address his anxiety. See e.g., [ECF No. 68-1 ¶ 30] (setting Benner's initial mental health treatment plan that called for regular meetings with mental health primary care and psychiatrist); [id. ¶¶ 38–40] (placing Benner in a restricted housing unit and meeting with him after he reported that he was in crisis);[6] [id. ¶ 48] (mental health primary care attempting to prescribe anxiety medication). Benner, however, was often resistant to mental health treatment. See e.g., [id. ¶ 42] (mental health clinician reporting Benner as "agitated and minimally cooperative"); [id. ¶ 47] (mental health primary care physician reporting Benner was "unable to engage in meaningful conversation about mental health related concerns" and that he reported "his blood pressure medication helped with anxiety" when topic of psychotropic medications came up); [id. ¶ 48] (refusing Clonidine for anxiety).

On December 23, 2020, as a result of the multiple sick slips submitted by Benner related to abdominal pain, nursing staff referred him to a mental health clinician to determine whether his concerns could be related to anxiety. [ECF No. 68-1 ¶ 50]. He was diagnosed with generalized anxiety disorder and prescribed medication. [Id.]. Nursing staff again referred Benner to a mental health clinician on January 12, 2021 following his multiple sick slips for chest pain. [Id. ¶ 59]. He denied any emergent mental health concerns and was receptive to supportive counseling. [Id.]. In February 2021, Benner's mental health team, including the

---

[6] Benner alleges that he was sent to restricted housing and the Department Disciplinary Unit ("DDU") as retaliation for trying to seek emergency medical attention. [ECF No. 71-1 at 59]. This is not borne out by the record. See Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (in viewing record favorably to non-movant, court need not look to "unsupported speculation") (internal quotation omitted).

regional mental health director and the psychiatrist, concluded that he appeared to meet the criteria for Somatic Symptom Disorder. [Id. ¶ 76].[7]

### C. Procedural History

Benner initiated this pro se action on December 18, 2020 while in custody at MCI-Cedar Junction in Walpole, Massachusetts. [ECF No. 1]. On February 9, 2021, Benner filed the operative amended complaint ("Amended Complaint" or "Am. Compl."), which the Court construed as alleging (1) Eighth Amendment violations pursuant to 42 U.S.C. § 1983, (2) conspiracy to violate his civil rights under 42 U.S.C. § 1983, (3) violation of the Health Insurance Portability and Accountability Act ("HIPPA"), (4) defamation, and (5) medical malpractice. [Am. Compl. ¶ 13; see also ECF No. 42 at 7]. Defendants moved to dismiss the Amended Complaint in its entirety on August 13, 2021. [ECF No. 30].[8] On March 30, 2022, the Court granted Defendants' motion to dismiss all claims except Benner's Eighth Amendment claims pursuant to 42 U.S.C. § 1983. [ECF No. 42].

Defendants moved for summary judgment on October 27, 2023. [ECF No. 67]. Benner opposed the motion on November 8, 2023. [ECF No. 71].

---

[7] Benner does not appear to dispute that the team reached this conclusion but does dispute its validity. [ECF No. 71 at 3]. Specifically, he asserts that "the nurses are the ones who referred me for crisis to make it look like [I] had somatic disease disorder so they could use that as a reason not to treat me." [Id.] Again, this speculation is not borne out by the record. Cochran, 328 F.3d at 6. That said, the Court does not view Benner's mental health diagnosis as material to whether he received adequate care for the reasons articulated infra.

[8] Benner's amended complaint also included allegations against another defendant, prison superintendent Douglas DeMoura. [Am. Compl. ¶ 2]. Defendant DeMoura moved to dismiss all claims against him on January 12, 2022, [ECF No. 40], and the Court granted his motion on March 30, 2022, [ECF No. 42].

### III. Legal Standard

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. When reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Id. The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must" point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file ... demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ...." Celotex Corp. v. Catrett, 477 U.S.

317, 323–24 (1986).  Once the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions."  Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

## IV.  Discussion

Defendants argue that they are entitled to summary judgment because "Benner's claim amounts to no more than a dispute over the adequacy of care provided" and he cannot show that Defendants acted with deliberate indifference to any serious medical need.  [ECF No. 68 at 7–21].  Although disjointedly, Benner asserts that Defendants acted with deliberate indifference in failing to provide him additional tests for food poisoning, worms, parasites, and other ailments and instead focusing primarily on the results of his September 2020 colonoscopy in recommending his treatment.  [ECF No. 71 at 2–4].

The Eighth Amendment protects prisoners from "deliberate indifference to serious medical needs," Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161–62 (1st Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 105–06 (1976)), meaning a violation arises when medical care is "so inadequate as to shock the conscience," id. at 162 (quoting Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir. 1991)).

To succeed on such a claim, a plaintiff must satisfy both an objective and subjective inquiry.[9]  Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015) (quoting Leavitt v. Corr. Med. Servs., 645 F.3d 484, 497 (1st Cir. 2011)).  The objective prong requires proof of a sufficiently serious

---

[9] Although described as two prongs, the First Circuit has recognized that there is often analytical and evidentiary overlap between the prongs.  See Kosilek v. Spencer, 774 F.3d 63, 83 n.7 (1st Cir. 2014) (en banc), cert. denied 575 U.S. 998 (2015) (describing how adequacy of care is germane both to objective need for surgery and to claimed deliberate indifference to that need).

medical need.  See id.  The need must be "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (en banc), cert. denied, 575 U.S. 998 (2015) (quoting Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990)).

The subjective prong requires the plaintiff to show that prison officials possessed a sufficiently culpable state of mind—namely, deliberate indifference to the claimant's health or safety.  Perry, 782 F.3d at 78.  "For purposes of this subjective prong, deliberate indifference 'defines a narrow band of conduct' and requires evidence that the failure in treatment was purposeful."  Kosilek, 774 F.3d at 83 (citation omitted).  "The obvious case would be a denial of needed medical treatment in order to punish the inmate."  Feeney, 464 F.3d at 162 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)).  Deliberate indifference may also be established by "wanton" or "reckless" actions, although recklessness is to be understood "not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable."  Id.

Under this formulation, an "inadvertent failure to provide adequate medical care" does not give rise to a constitutional violation because it "cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"  Estelle, 429 U.S. at 105–06.  Similarly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [Supreme Court case law] be condemned as the infliction of punishment."  Farmer v. Brennan, 511 U.S. 825, 838 (1994).  Thus, substandard treatment, "even to the point of malpractice," is not enough to show an Eighth Amendment violation.  Feeney, 464 F.3d at 162 (quoting Layne v. Vinzant, 657 F.2d 468, 474

(1st Cir. 1981)).  This is because the Constitution "does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing."  Kosilek, 774 F.3d at 82.  Accordingly, when the treatment simply reflects a disagreement on the appropriate course of treatment, such a dispute may present a colorable claim of negligence, but will fall short of alleging a constitutional violation.  Id.; see also Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987) ("Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, [the Court] will not second guess the doctors.").

Although Benner asserts that Defendants "deliberately denied [him] medical treatment," the Court finds that even when viewing the facts in the light most favorable to Benner, a reasonable factfinder could not conclude that Defendants were deliberately indifferent to Benner's medical needs.  Regarding his GI symptoms, with the exception of a few instances in December—which occurred three months into Benner being seen by medical staff at least weekly for abdominal and related pain— Benner was seen, evaluated, and offered treatment for his symptoms promptly upon raising them.  In fact, the record at this stage reflects that, between his intake in September 2020 and the end of the year, Benner was seen by nurses and providers no less than eighteen times for his GI concerns (which does not include his various reports of similar issues to mental health staff).  Although Defendants could have offered Benner the various tests for worms, parasites, and other infection that he requested, Benner received a full GI workup at HOC before his arrival at MCI-Cedar Junction, which indicated that he was experiencing pain because of internal hemorrhoids.  Defendants' decision to use that workup to inform their treatment rather than to perform additional testing amounts to nothing more than a dispute over the appropriate course of treatment.  Kosilek, 774 F.3d at 82.  Moreover, Defendants

did perform additional physical, rectal, and anal examinations, and continued to monitor Benner's vitals for sign of infection.

The same applies to Defendants' treatment of Benner's chest pain. While Benner contends that he should have been tested for COVID-19 weeks earlier than he was, the record reflects that nurses and providers did test Benner for COVID-19 after Defendant Vieira determined he was presenting with symptoms. Defendant Hameed additionally followed up with him regarding lingering symptoms, including by providing him with x-rays and an EKG, which were both ultimately normal. Again, this amounts to nothing more than a dispute as to the appropriate course of treatment. Kosilek, 774 F.3d at 82.

Meanwhile, Defendants, as well as other nurses and providers, worked to alleviate Benner's symptoms by repeatedly referring him to various mental health clinicians for help managing his anxiety, which they suspected could have been exacerbating his symptoms. These mental health clinicians developed plans for his treatment, discussed positive coping skills, recommended medication, and checked in regularly with Benner regarding his state of mind. Thus, Defendants' actions with regard to Benner's mental health do not evidence a purposeful failure in treatment. Kosilek, 774 F.3d at 83.

V.     **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment, [ECF No. 67], is GRANTED.

**SO ORDERED.**

August 13, 2024                                              */s/ Allison D. Burroughs*
                                                             ALLISON D. BURROUGHS
                                                             U.S. DISTRICT JUDGE